Abram CHASINS, Plaintiff,

v.

SMITH, BARNEY & CO., Incorporated,
Defendant.

No. 66 Civ. 1578.

United States District Court
S. D. New York.

Sept. 30, 1969.

See also D.C., 306 F.Supp. 177.

Graubard & Moskovitz, New York City, for plaintiff; Leonard Holland, Edward M. Rosenfeld, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant; Marvin Schwartz, Michael M. Maney, New York City, of counsel.

## OPINION

BONSAL, District Judge.

This action brought under the Securities Act of 1933, 15 U.S.C. § 77a et seq., and the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., for damages resulting from defendant's alleged violations of the Acts, and pendent common law violations, in handling plaintiff's securities brokerage account, was tried before the court without a jury. Plaintiff is a retired musicologist, author, and lecturer. In 1961, when the transactions in question occurred, he was the musical director of radio station WQXR in New York City, and was the commentator on a musical program which was sponsored by defendant, a stock brokerage firm. Plaintiff testified that he opened his brokerage account with defendant because it sponsored his program.

Plaintiff charged that defendant was under a common law fiduciary duty to plaintiff in all the transactions involved in this action because it undertook to manage his account on a discretionary basis and that it breached that duty.

Plaintiff also charged that defendant had a contractual obligation to manage plaintiff's account so that he would own "blue chip" securities, and that this contract was breached by defendant in all of its transactions for plaintiff's account.

Finally,[1] plaintiff charged that defendant bought and sold securities for his account and failed to disclose, among other things, (1) that in some of these transactions defendant dealt with him as principal; (2) the price it obtained on resale of New York City Housing Authority Bonds purchased from plaintiff; (3) that defendant was making a market in some of the stocks which he purchased. These are claimed to be omissions to disclose material facts in violation of Section 17 of the Securities Act of 1933, 15 U.S.C. § 77q, and of Sections 10(b) and 15(c) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j (b) and 78o(c) respectively, and Rules 10b–5 and 15c–1—4, 17 C.F.R. 240.10–b and 240.15c–1—4 respectively, promulgated thereunder.

The parties stipulated to the following facts in the pretrial order:

"1. Plaintiff was employed by Radio Station WQXR in June 1961 when he orally retained defendant to act as his stock broker in the presence of his wife and defendant's authorized agents, John L. Montgomery and Thomas N. Delaney, Jr.

2. During, prior and subsequent to acting as plaintiff's stockbroker, defendant sponsored various WQXR programs including those of which plaintiff was commentator.

3. In all transactions set forth at Paragraph 17 of the complaint, defendant acted in at least two capacities: (1) as plaintiff's stockbroker; (2) as principal, i.e. the owner of the security being sold to plaintiff. In no such sale to plaintiff by defendant was any commission charged or paid, nor did defendant disclose: (a) the nature of plaintiff's account with defendant, whether it was a 'cash' account or otherwise, as called for by its own form of Confirmation and (b) the information described in Paragraphs

---

1. The court dismissed plaintiff's claim for tortious interference with his contract of employment with WQXR at the beginning of the trial, without prejudice to bringing an action in the proper forum since there was neither diversity nor pendent jurisdiction.

22 and 23 of the Complaint. Defendant did not disclose to plaintiff that it had acted as 'underwriter' as defined by the Securities Act of 1933, in connection with the distribution of securities of The Welch Scientific Co., one of the issuers listed in Paragraph 17.[2]

4. Defendant in the capacity of stockbroker sold various securities of Abram Chasins to the public on or about the date of its sales of its own securities to Abram Chasins described in subparagraph 3 hereof, after which the proceeds of such public sales were applied to pay obligations of plaintiff to defendant arising in connection with such private transactions with plaintiff.

5. On or about November 1, 1961 and December 22, 1961, defendant, in the capacity of stockbroker and also in the capacity of principal, purchased from plaintiff his investment grade New York City Housing Authority Bonds. Defendant did not subsequently liquidate any other position of plaintiff although it continued to act as his stockbroker until June, 1962. In no such purchase as principal from Abram Chasins did defendant disclose the nature of his account with defendant—whether it was a 'cash' account or otherwise as called for by its form of Confirmation—nor did it disclose the information described at Paragraphs 22 and 23 of the Complaint. On each Monday of the week during which it executed a purchase from plaintiff of his New York City Housing Authority Bonds, and for a substantial period of time prior and subsequent thereto, defendant advertised on WQXR the advisability of the purchase, not sale, of municipal bond securities. No action, other than arranging for such matter to be broadcast to the public generally, was taken by defendant to disclose such broadcast matter to plaintiff.

6. The only written communications between plaintiff and defendant have been marked as exhibits to plaintiff's deposition or have been or are being supplied to plaintiff in response to his Interrogatory 9. The confirmation slips mailed by defendant to plaintiff covering transactions in his account and defendant's monthly ledgers of such account that have been made available to plaintiff accurately set forth the information purported to be stated therein.

7. The only reference in any oral or written communication between plaintiff and defendant to the fact that defendant was dealing with plaintiff in the capacity as principal as well as stockbroker was contained in the confirmation of such transaction sent after each such transaction.

8. By letter dated July 14, 1961 (see Paragraph 5(a) (1)T) defendant sent and plaintiff received written recommendations for the purchases and sales executed for plaintiff's account on July 19, 1961 as set forth in Paragraphs 16 and 17 of the Com-

---

2. Paragraph 17 of the complaint alleges the following purchases for plaintiff's account:

| Date | Number of Shares | Class | Company |
|---|---|---|---|
| 7/19/61 | 200 | Common Stock | Welch Scientific Company |
| 7/19/61 | 200 | Common Stock | Tex-Star Oil and Gas Corp. |
| 7/19/61 | 200 | Common Stock | Howard Johnson Corp. |
| 8/22/61 | 200 | Common Stock | Welch Scientific Company |

Paragraph 22 of the complaint alleges:

"At no time did Smith, Barney & Co. disclose to plaintiff the price it had paid for the securities sold, as principal and not as agent, by it to plaintiff, nor did it ever disclose the price it received on resale of the securities bought by it from plaintiff as principal and not as agent."

and paragraph 23 alleges that the omissions violate the federal securities acts.

plaint. Said recommendations included an analysis prepared by defendant of certain of the securities in plaintiff's portfolio and all of those which were recommended for purchases.

9. By letter dated April 27, 1962 (5(a) (1)U) defendant sent and plaintiff received certain information concerning the securities in plaintiff's portfolio. No transactions for plaintiff's account were effected after this letter and plaintiff withdrew his account and portfolio from defendant in or about June, 1962."

*Common Law Claims*

Plaintiff relied on his own testimony and that of Mr. Delaney, a registered representative employed by defendant. In June 1961, plaintiff, Delaney and Mrs. Chasins met at defendant's branch office on Fifth Avenue with Mr. Montgomery, the office manager, and agreed that defendant would receive plaintiff's securities holdings and would send plaintiff its recommendations. Plaintiff testified that he discussed his securities holdings with Montgomery and told him that he was mainly concerned with conserving his capital, and that what he "naturally" wanted was an appreciation of the stocks which he held, with safety. In his examination before trial he testified that his goal was income.

Plaintiff testified that he told Montgomery and Delaney that he wanted to place himself entirely at their disposal, because he had an "encyclopedic ignorance" of securities and figures, and he trusted them. He also testified that he asked Montgomery whether it would be advisable to buy stock like AT&T or General Electric, since he had seen General Electric "considerably higher and was now back to 60 again, and did he not think it would be an advisable thing to buy that stock, being that it was so depressed," and that Montgomery advised against General Electric because it was involved in some suits, and against AT&T because he thought there was not much room for growth. Plaintiff testified that in going over his portfolio with Montgomery, he "was explaining a few things that he (Montgomery) did not know, a few stocks which were strangers to him," such as his holdings in a company called Fawick; he said that he told Montgomery that he had bought Fawick on the recommendation of a friend of his who told him that it had excellent prospects, and that it later merged with Yale and Towne.

Delaney testified that he had no discretionary accounts from June 1961 to June 1962, that he had been told by Montgomery in that period that Smith, Barney's policy was to discourage discretionary accounts, that a power of attorney (as distinguished from a stock power) would be required for any discretionary account, and that he never received a power of attorney from plaintiff.

On July 14, 1961, Delaney sent plaintiff an inventory of plaintiff's securities portfolio, and defendant's recommendations with respect thereto, a study of Tex-Star Oil and Gas Corporation prepared by Smith, Barney's Research Department, and a prospectus relating to the common stock of the Welch Scientific Company. Plaintiff thereafter telephoned Delaney and ordered him to carry out the recommendations, which he did.

In August, 1961, plaintiff called Delaney to inquire "what was wrong" because the Welch Scientific Company stock which he had purchased had gone down 8 points. Delaney checked and called plaintiff back, informing him that they knew of nothing wrong. Plaintiff then inquired whether he should sell out or buy more, and Delaney told him that based on the Research Department's report that the stock was "still okay," it would be "okay" to buy more stock at the lower price, and this was done. Delaney testified that the effect of this was to lower the average cost of plaintiff's investment in the stock, and plaintiff testified that he understood this technique of cost averaging, which he referred to as "equalizing."

In November and December plaintiff called Delaney and expressed a desire to

purchase additional shares of Western Tablet and Stationery Corporation, a paper company; plaintiff had bought stock in the company on the recommendation of an old friend of his who was an attorney for the company and who had told him that it was planning expansion. Plaintiff testified that he told Delaney that the price of Western Tablet had dropped, and asked him whether he should buy more shares to "equalize" as he had done with the Welch Scientific Company stock. He said that Delaney told him he would check with the Research Department, and later called back and told plaintiff, "Mr. Chasins, we consider Western Tablet a present at this price." Plaintiff asked Delaney what he would suggest selling in order to raise capital to buy the stock; Delaney testified that he suggested selling plaintiff's New York City Housing Authority Bonds as a source of capital, as they had been earmarked for sale earlier, and plaintiff agreed.

Plaintiff testified that he did not recall any conversation when Delaney suggested that it would be a good idea to sell the New York City Housing Authority Bonds, and said that he remembered very well when he was first informed that they had been sold, because he had always thought of them as "safety valves," "something that should not be sold." He did say, however, that it was possible that Delaney might have suggested that they should be sold if there were something to buy which would be better. At his examination before trial, plaintiff testified that Delaney had advised him to sell the bonds and that he had been startled by the advice, and by the information that Smith, Barney considered them poor investments.

In addition to his investments in Fawick and Western Tablet stock already mentioned, plaintiff testified that he bought stock in Supersol, Ltd., an Israeli supermarket stock, after a trip to Israel where he saw a supermarket which he found "very exciting," and which he judged to be "flourishing," be-cause it was so complete and had so many customers. He testified that he made inquiries and found that it was backed by the Seagrams company, and this gave him even more confidence, because he was a personal friend of the president and chairman of the board of Seagrams. He said that several Israeli businessmen told him that Supersol planned to expand, and he concluded that it had great potential for expansion, particularly in view of the expansion of Israel in general, and the success of supermarket chains in the United States.

Finally, plaintiff testified that he frequently engaged in discussions of securities with brokers and other people on social occasions, in the hope of getting a "successful tip."

Plaintiff's testimony at the trial does not support his contentions that he was completely ignorant as to securities and depended entirely on the defendant. On the contrary,

1. Plaintiff was not an ignorant investor, and on more than one occasion made investments on the basis of his own information and on his own initiative. He liked to speculate on the basis of "tips" which he heard in the course of his professional and social dealings.

2. Plaintiff concededly approved all the transactions at the time they were made, so that the account was not a discretionary account.

3. Plaintiff urged defendant to make speculative gains on speculative stocks.

4. There was no oral contract that plaintiff's account should only include "blue chip" securities. Plaintiff's testimony shows that he liked to speculate in what he thought would be "growth stocks."

■ Defendant did not breach its fiduciary duty to follow plaintiff's instructions and to obtain his approval to each transaction, Opper v. Hancock Securities Corporation, 250 F.Supp. 668 (S.D.N.Y.1966), aff'd, 367 F.2d 157 (2d Cir. 1966).

*Transactions Effected by Defendant as Principal*

In a number of transactions, defendant bought securities from or sold securities to plaintiff as principal for its own account. Section 15(c) (1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(c) (1), provides:

"No broker or dealer shall make use of the mails or of any means or instrumentality of interstate commerce to effect any transaction in, or to induce the purchase or sale of, any security (other than commercial paper, bankers' acceptances, or commercial bills) otherwise than on a national securities exchange, by means of any manipulative, deceptive, or other fraudulent device or contrivance. The Commission shall, for the purposes of this subsection, by rules and regulations define such devices or contrivances as are manipulative, deceptive or otherwise fraudulent."

Rule 15c1—4, 17 C.F.R. § 240.15c1—4, adopted pursuant to section 15(c) (1), provides in relevant part:

"The term 'manipulative, deceptive, or other fraudulent device or contrivance,' as used in section 15(c) (1) of the act is hereby defined to include any act of any broker or dealer designed to effect with or for the account of a customer any transaction in, or to induce the purchase or sale by such customer of, any security * * * unless such broker or dealer, at or before the completion of each such transaction, gives or sends to such customer written notification disclosing (a) whether he is acting as a broker for such customer, as a dealer for his own account, as a broker for some other person, or as a broker for both such customer and some other person; * * *"

and Rule 15c1—1, 17 C.F.R. § 240.-15c1—1, defines the term "completion of the transaction" as:

"(1) In the case of a customer who purchases a security through or from a broker or dealer, except as provided in subparagraph (2) of this paragraph, the time when such customer pays the broker or dealer any part of the purchase price, or, if payment is effected by a bookkeeping entry the time when such bookkeeping entry is made by the broker or dealer for any part of the purchase price; * * *"

and as:

"(3) In the case of a customer who sells a security through or to a broker or dealer, except as provided in subparagraph (4) of this paragraph, if the security is not in the custody of the broker or dealer at the time of sale, the time when the security is delivered to the broker or dealer, and if the security is in the custody of the broker or dealer at the time of sale, the time when the broker or dealer transfers the security from the account of such customer."

Defendant mailed plaintiff confirmation slips prior to the "completion of the transaction" as defined in Rule 15c1—1 and these confirmation slips were received by plaintiff.

Written in fine print over the box on each confirmation slip which contains the information regarding the particular transaction are the words:

"We have made the following transaction subject to the terms and conditions set forth on the reverse side. We have acted AS YOUR AGENT for your account and risk unless otherwise stated in code below."

In the box containing the information concerning the transaction, there are four columns, headed "Quantity," "Security," "Price," and "Code," and in each code column there is the typed digit "7." At the bottom of the confirmation slip there is a box headed "Code," with digits from 1 to 8, each followed by an explanation. On the confirmation slips printed in red representing sales by plaintiff, the code for "7" reads:

"As principal and for our own account we have bought from you."

On the confirmation slips printed in black representing purchases by plaintiff, the code for "7" reads:

"As principal and for our own account we have sold to you."

These confirmation slips are identical in appearance, except as to the typed matter relating to the particular transaction, to the confirmation slips for those transactions executed by defendant as agent, except that the code on those slips is either "1" or "2," representing the New York and American Stock Exchanges respectively. Plaintiff received no notice that defendant was dealing with him as principal except that contained in the confirmation slips.

■ The confirmation slips are relatively simple and self-explanatory forms; the print, though fine, is uniform, and the material information is printed on the front. Plaintiff testified that he was quite well aware of what it would mean if he were told that the stock reflected in a particular confirmation slip was owned by and sold to him by the defendant. Accordingly, defendant gave plaintiff "written notification disclosing" that it was acting as principal, in compliance with Rule 15c1—4; see Avern Trust v. Clarke, 415 F.2d 1238, (7th Cir. July 15, 1969); Opper v. Hancock Securities Corporation, *supra*.

### The New York City Housing Authority Bonds

■ Defendant bought from plaintiff as principal 30,000 New York City Housing Authority 2½% bonds for $23,-165.02. Plaintiff knew that defendant was purchasing these bonds for its own account, but contends that he was misled by defendant's advice to sell the bonds at a time when defendant in commercials broadcast over WQXR was recommending purchase of municipal bonds. Defendant was not misled; first, his contention that he was not aware of defendant's commercials before he sold the bonds strains credulity; second, the commercials recommended municipal bonds generally, not these bonds in particular; third, the commercials merely proclaimed in a general way the advantages of municipal bonds in providing tax-free income, while plaintiff's investment goal was capital appreciation.

■ Plaintiff also contends that defendant should have disclosed to him the price it received on resale of the bonds, citing Hughes v. Securities and Exchange Commission, 85 U.S.App.D.C. 56, 174 F.2d 969 (1949), but under the circumstances the disclosure that defendant was acting as principal was sufficient. Disclosure of the price that defendant received for the bonds on resale would not have affected plaintiff's decision to sell the bonds when he did, because plaintiff and defendant had already agreed that the bonds would be sold when a suitable investment arose, and they were sold at the time because plaintiff wanted funds to purchase Western Tablet stock.

### Transactions in Securities in which Defendant was Making a Market

Defendant failed to disclose to plaintiff that it was making an over-the-counter market in Welch Scientific Company, Howard Johnson Company, and Tex-Star Oil & Gas Company, shares of which companies it sold plaintiff as principal. Delaney testified that defendant was making a market in these securities, and the record of defendant's trading position and transactions prepared by counsel reveals that at least from June 30, 1961, defendant was trading in these stocks and held positions in them during the times in which plaintiff purchased them from defendant. There was no evidence that plaintiff was aware that defendant was doing so.

Plaintiff was entitled to know that at the time he purchased these securities from defendant it was making a market. Such information was material to the plaintiff in considering the price at which he purchased the securities, and to what extent the price was based on defendant's own market activities. List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir. 1965), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); Norris

& Hirshberg v. Securities and Exchange Commission, 85 U.S.App.D.C. 268, 177 F.2d 228 (1949); Bloomenthal, "The Case of the Subtle Motive and the Delicate Art—Control and Domination in Over-the-Counter Securities Markets," 1960 Duke L.Rev. 196.

Plaintiff relief on defendant as to the price which he paid for the securities, and he relied on defendant to obtain the best price available, not a price set by defendant. Plaintiff could "have been influenced to act differently than he did if the defendant had disclosed to him the undisclosed fact," List v. Fashion Park, *supra*, 340 F.2d at 463.

■ Defendant's failure to disclose that it was making a market in the securities it sold plaintiff was an omission

"to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Rule 10b–5, 17 C.F.R. § 240.10b–5.

Since defendant has violated Rule 10b–5 with respect to these securities, plaintiff is entitled to recover his damages resulting from defendant's violation, J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2d Cir. 1951).

■ In the absence of evidence as to the true value of the securities sold to plaintiff, the proper measure of damages is the loss to plaintiff upon resale of the securities sold to him, Sarlie v. E. L. Bruce Co., 265 F.Supp. 371 (S.D. N.Y.1967). The transactions involved were as follows:

| Date | Number of Shares Bought | Company | Cost |
|---|---|---|---|
| July 25, 1961 | 200 | Tex-Star Oil & Gas Corp. | $ 7,300.00 |
| July 25, 1961 | 200 | Welch Scientific Company | 9,900.00 |
| July 25, 1961 | 200 | Howard Johnson Company | 9,500.00 |
| August 28, 1961 | 200 | Welch Scientific Company | 8,250.00 |
| | | | $34,950.00 |

Plaintiff subsequently sold these securities:

| Date | Number of Shares Sold | Company | Net Price |
|---|---|---|---|
| June 28, 1962 | 400 | Welch Scientific Company | $ 6,095.52 |
| June 28, 1962 | 400 (2 for 1 split) | Tex-Star Oil & Gas Corp. | 3,918.40 |
| June 28, 1962 | 200 | Howard Johnson Company | 6,319.44 |
| | | | $16,333.36 |

$34,950.00
16,333.36

with a resultant loss of $18,616.64.

The foregoing constitutes the court's findings of fact and conclusions of law, F.R.Civ.P. 52(a).

The clerk may enter judgment in favor of plaintiff Abram Chasins and against defendant Smith, Barney & Co., Inc. in the amount of $18,616.64, with interest from June 28, 1962, and costs of the action.

It is so ordered.