**COMMITTEE FOR NEW MANAGE-
MENT OF BUTLER AVIA-
TION, Plaintiffs,**

v.

**G. Norman WIDMARK et al., Defendants.**

**Civ. A. No. 71 C 1528.**

United States District Court,
E. D. New York.

Dec. 13, 1971.

---

Arnold I. Roth and Joel W. Sternman, Rosenman, Colin, Kaye, Petschek, French & Emil, New York City, for plaintiffs.

Louis Nizer and Myron Saland, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendants.

NEAHER, District Judge.

This civil action for injunctive relief arises out of an ongoing proxy contest for the election of directors of defend-

ant Butler Aviation International, Inc. ("Butler") at the annual meeting of stockholders presently set for December 14, 1971.[1] Plaintiffs commenced the action by filing their complaint on the afternoon of November 24, 1971, and simultaneously presenting *ex parte* an order to show cause application to bring on an accelerated motion for a preliminary injunction. The complaint alleged that defendants were soliciting proxies for the stockholders' meeting by the use of false and misleading proxy solicitation material, and also obtaining post-dated proxies, in violation of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and the Security and Exchange Commission's Proxy Rules 14a–9 and 10, 17 C.F.R. 240.14a–9, 14c–10. Voluminous affidavit and exhibit material was presented in support of the motion.

The imminence of the stockholders' meeting and assurances of plaintiffs' counsel that the defendants would be served as speedily as possible over the Thanksgiving holiday prompted the court to direct a preliminary response by defendants on November 29, 1971. On that date defendants appeared specially to contest jurisdiction over them on the ground of claimed defective service. They withdrew that motion, however, on plaintiffs' agreement that the motion for a preliminary injunction and cross-motions to be made by defendants be heard on answering and replying affidavits and documentary exhibits—liberally supplied by both sides. Following submission of these papers a lengthy oral argument was held December 6th, supplemented by submission of additional papers and memoranda, the last arriving December 9th.

As a result the court must determine under great pressure of time (1) plaintiffs' motion for a preliminary injunction for the claimed Section 14(a) viola-

1. The meeting was set by order of the Delaware Chancery Court on application of plaintiff Paul S. Dopp, a large stockholder and former board chairman, president and chief executive officer of Butler, who resigned those posts on January 4, 1971, apparently at the request of defendants, Butler's present management. Butler, although a publicly-owned corporation, has not had a stockholders' meeting since May 1969.

tions by defendants and post-dated proxies; (2) defendants' cross-motion for the same relief for claimed similar violations by plaintiffs; and (3) defendants' cross-motion challenging the legality of plaintiffs' committee and the validity of proxies obtained by it as a result of plaintiff Dopp's admitted non-compliance with Section 13(d) of the Act, 15 U.S.C. § 78m (d). The court has been aided in this task by the parties' agreement that the documents described in the Appendix hereto, marked Court's Exhibits 1 to 11, inclusive, comprise, broadly speaking, all the respective proxy solicitation material which did or could have come to the attention of Butler's stockholders or some of them. By far the larger bulk of the voluminous documentation submitted consists of papers in other litigation involving one or more of the parties, excerpts from depositions, corporate memoranda and copies of correspondence—all offered to support the contending claims that the other side's proxy solicitation material (Court Exhs. 1–11) requires immediate injunctive correction and rejection of proxies already obtained thereby.

Some background facts require mention at the outset for purposes of perspective. Butler is a Delaware corporation having its principal office in Englewood Cliffs, New Jersey. Its principal business is aviation sales and service operations at major airports throughout the United States and motor carrier transportation. Butler has 1,068,022 voting shares outstanding, of which 898,-022 are shares of common stock. The shares are traded on the American Stock Exchange. Butler's two principal stockholders are plaintiff Paul S. Dopp (see n. 1, *supra*) and American Electronic Laboratories, Inc. (AEL), one of whose two controlling stockholders is defendant Leon Riebman, who became a director of Butler in 1971. Dopp claims to own beneficially 196,100 shares (18% of outstanding voting securities) and AEL owns beneficially 143,900 shares (14% of outstanding voting securities). Aside from AEL's ownership, the individual defendants (excluding C. Robert Schaeffer), as a management group, own beneficially an aggregate of 18,600 shares, less than 2% of outstanding voting securities.

The election of a board of six directors is the only question before Butler's stockholders at the December 14th meeting. It is also clear that plaintiff Dopp is the spearhead and muscle of the plaintiff "Committee for New Management of Butler Aviation" ("Committee"), composed of Dopp and the other named plaintiffs, which is seeking to unseat the defendant directors. Dopp was the moving party in bringing about the December 14th meeting (Exh. 8, Appendix). The Committee's proxy statement also acknowledges "It is presently contemplated that Mr. Dopp will pay all of the expenses of the Committee's solicitation"—estimated to amount to approximately $70,000—for which reimbursement from Butler will be sought if the Committee elects its candidates. (*Id.*) It is not surprising, therefore, that management's proxy solicitation material describes in considerable detail and comments strongly about a series of corporate transactions management asserts Dopp initated without authorization when he was board chairman, president and chief executive officer of Butler, and for which he is being sued by Butler in the New Jersey Superior Court to recover some $600,000 of corporate funds claimed to have been wasted or misused for his own personal purposes. (Exh. 6, Appendix.) Plaintiff Committee's proxy statement also describes extensively various lawsuits brought by or against Mr. Dopp relating to Butler, including the aforementioned New Jersey Superior Court action, from which it is clear that Mr. Dopp has entered denials of liability against Butler's claims (Exh. 8, Appendix).

If, as both sides contend, material omissions of fact or false or misleading statements have been made in the proxy solicitation material of either side in vio-

lation of S.E.C. Proxy Rule 14a–9(a),[2] there is standing to maintain a private action for curative injunctive relief upon a proper showing. General Time Corporation v. Talley Industries, Inc., 403 F.2d 159, 161 (2 Cir. 1968).

The focus of inquiry in a case such as this is on the materiality of the claimed omission or false or misleading statements. Although, as pointed out in *General Time, supra,* "[t]he standard of materiality is somewhat more elusive in relation to statements issued in a contested election . . . . issuers of such statements should be held to fair accuracy even in the hurly-burly of election contests." 403 F.2d at 162. The same authority defines the test in these terms:

> The test [of materiality], we suppose, is whether, taking a properly realistic view, there is a substantial likelihood that the misstatement or omission may have led a stockholder to grant a proxy to the solicitor or to withhold one from the other side, whereas in the absence of this he would have taken a contrary course. *Id.*

With these principles in mind we turn to the respective motions of the parties.

### *Rule 14a–9(a) Violations Claimed by Plaintiffs*

Plaintiffs' complaint, as supplemented, specifies 15 instances of failures to disclose or false or misleading statements in defendants' proxy solicitation material. On the oral argument, however, plaintiffs' counsel agreed, without conceding total abandonment of the other specifications, that the principal claimed violations were:

1. Defendants' failure to disclose in Butler's proxy statement (Exh. 6, Appendix) that Mr. Dopp, as defendant, had interposed an answer in the New Jersey Superior Court action containing denials and defenses.

2. Defendants' description in Butler's proxy statement (Exh. 6, Appendix) is misleading in making it appear that the series of corporate transactions involved in the New Jersey action are multiple actions rather than a single action.

3. Defendants misrepresented in a press release of November 10, 1971 (Exh. 1, Appendix) the reasons why settlement conferences between management and Mr. Dopp broke off and in fact violated an agreement to hold those discussions in confidence.

4. Defendants incorrectly overstated Butler's 1970 loss from continuing operations by over 100% in a letter to stockholders of November 13, 1971 (Exh. 3, Appendix) with resulting detrimental impact on stockholders regarding Mr. Dopp's management.

5. Defendants misstated in the addendum to Butler's 1970 annual report (Exh. 4, Appendix) that a payment of $100,000 was made to the Community Savings and Loan Association of Fredericksburg, Texas, on account of principal and interest on an overdue note of a Butler subsidiary, whereas in fact $25,000 of that $100,000 went to pay attorneys' fees of the creditor bank because of legal services in connection with the default.

Plaintiffs conceded on the argument that the other specifications of violation itemized in their complaint were of lesser importance than those listed above. In the court's opinion none of the principal objections demonstrates a statement in defendants' proxy material which is false or misleading with respect to a

---

2. Rule 14a–9. False or Misleading Statements.

(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting, or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading. (17 C.F.R. 240.14a–9.)

material fact or the omission of a material fact as called for by the proxy rule. Considering these objections *seriatim*:

■ 1. Defendants' proxy statement (Exh. 6, Appendix) states with reference to the New Jersey Superior Court action against Mr. Dopp that "This action is now pending." Nothing else is said or implied that Mr. Dopp is not contesting the action or has admitted the claims made. The very language quoted clearly implies that the action remains undetermined. While it is customary in disclosing litigation in a corporation's annual report to state that an action is being prosecuted or defended by management,[3] nothing has come to the court's attention to support plaintiffs' contention that omitting to state expressly that Mr. Dopp is defending Butler's action is a material non-disclosure in these circumstances. Indeed, if defendants had made any affirmative statement regarding Dopp's defense, they would have risked a charge that it was not accurate or complete and hence misleading. In view also of plaintiffs' counter-proxy statement (Exh. 8, Appendix), issued two days after Butler's, which does state that Dopp has denied lack of authorization and liability for the transactions sued on in New Jersey, the test of a "material" omission has not been met.[4]

■ 2. Undeniably Butler's proxy statement (Exh. 6, Appendix) in the section entitled "Transactions With Management and Others" repeats five times that Butler has instituted a legal action against Mr. Dopp in the Superior Court of New Jersey, Chancery Division, Bergen County. The statement occurs a sixth time in connection with a claim against Dopp & Company. In each instance there follows the sentence "This action is now pending." Plaintiffs con-

tend this is misleading because it makes it appear that Butler is suing Dopp not once but five or six times. Such a contention is captious. The repetition was dictated by the need for lengthy explanation of each of the six separate and unrelated corporate transactions for which Dopp and Dopp & Company are being sued. There is no claim of exaggeration of damages and no reason is apparent for believing that stockholders would reach a different conclusion regarding Mr. Dopp if they were expressly informed that all six claims were embraced in a single lawsuit. Indeed, plaintiffs' reference to these claims in their proxy statement (Exh. 8, Appendix) parallels that of defendants and concludes with repeated denials of liability on Dopp's part.

3. Plaintiffs' claim of unfairness and violation of confidence regarding the breaking off of settlement discussions relates not to formal proxy solicitation material but to a Butler press release of November 10, 1971 (Exh. 1, Appendix). Plaintiffs complain chiefly of the last two sentences in this paragraph of the release:

"Negotiations to recover company funds have taken place with Mr. Dopp ever since late 1970 when the Butler Aviation Board of Directors first learned of his unauthorized expenditures," a company spokesman said. "Mr. Dopp, however, has not returned any of the Company funds. Instead he has started a number of lawsuits involving the Company and has now threatened a proxy fight by filing a slate of nominees for directors, and negotiations have broken off."

Defendants deny that press releases as such reach the eyes of Butler stockholders (of which there are about 1600) but only as interested newspapers edit them.

---

3. As defendants have done here in Butler's annual report (Exh. 4, Appendix).

4. The court reaches this conclusion mindful of the admonition that stockholder disputes should not be viewed as "political contests, with each side free to hurl charges with comparative unrestraint, the assumption being that the opposing side is then at liberty to refute and thus effectively deflate the 'campaign oratory' of its adversary." *Securities and Exchange Commission v. May*, 229 F.2d 123, 124 (2 Cir. 1956).

On November 11, 1971, presumably as a result of defendants' release, the *Wall Street Journal* reported its version thereof. With respect to settlement negotiations, the article stated:

> A Butler spokesman said the company had avoided announcing the suit until the present because it was trying to work out a settlement with Mr. Dopp. The spokesman said Butler decided to announce the suit because of Mr. Dopp's recent actions against the company. (Exh. 3, Appendix.)[5]

■ 4. Admittedly defendants' November 13, 1971 letter to stockholders (Exh. 3, Appendix) accompanying their proxy statement states:

> For the same period last year when *Mr. Dopp was Chief Executive Officer, the Company suffered a loss of $1,605,000* of which $899,000 or 51 cents loss per share was from continuing operations and $1,157,000, net of taxes, or $1.31 loss per share was from discontinued operations for a total net loss of $1.82 per share. (Emphasis as in original.)

Plaintiffs correctly complain that the figure "$899,000" is erroneous and should read "$448,000", pointing to Butler's unaudited Consolidated Statement of Operations for the nine months ending September 30, 1971 (Exh. 4, Appendix). While admitting that the 51 cents loss per share in the above quotation is correct as based on a $448,000 rather than an $899,000 loss, plaintiffs nevertheless contend that stockholders are still being misled because Butler's correction is "buried" on the last page of defendants' latest hortatory letter to stockholders of November 26, 1971 (Exh. 11, Appendix).

The court is persuaded that defendants' original statement was inadvertently incorrect; that stockholders would be more inclined to note the loss per share, which was correct; that the correct dollar loss could be found in the nine-months statement forming part of Butler's proxy material; and that the correction made in defendants' later letter is adequate.

■ 5. The court is likewise persuaded that plaintiffs' criticism of the mention given Butler's payment to the Texas bank lacks substance (Exh. 4, Appendix). It accepts the representation of defendants' counsel that under Texas law incorporated in the unpaid note obligation of Butler's subsidiary, counsel fees arising out of the default are included as part of principal indebtedness. Plaintiffs make no claim that the entire $100,000 was not in fact paid or that Butler did not avoid imminent foreclosure and gain time to negotiate a refinancing of the note. Certainly this objection is hardly in need of the strong medicine of injunctive relief.

After careful scrutiny of the voluminous affidavits and documents submitted by plaintiffs the court is not persuaded they have made a sufficient showing by clear and convincing facts that defendants' proxy solicitation material warrants the preliminary injunctive relief plaintiffs seek. The court cannot overlook the fact that virtually all proxy material of both sides had reached the stockholders and the election was imminent when the matter was heard. While the court believes its views regarding plaintiffs' objections are sound, it is also aware that injunctive relief now—on the very eve of the election—would undoubtedly come to the stockholders' attention and be viewed by them as a final determination of wrongdoing on the part of management. See *Kauder v. United Board & Carton Corp.*, 199 F.Supp. 420 (S.D.N.Y.1969). In Judge Feinberg's words in *Kauder*, ". . . I find that the harm which is likely to result to defendant[s] if the injunction is issued and is ultimately proved unwarranted outweighs the possible harm to plaintiff[s] if the preliminary injunction is erroneously denied at this time." 199 F.Supp. at 424.

---

5. *The New York Times*, in a brief article the same day, did not mention settlement.

■ Before turning to defendants' cross-claim that plaintiffs' proxy material is in violation of Rule 14a–9(a), consideration must be given to plaintiffs' further claim that defendants have been soliciting post-dated proxies in violation of Rule 14a–10.[6]

Plaintiffs produced an affidavit of Laverne Troutt, Fort Lauderdale, Florida, a Butler stockholder owning 500 common shares. Mr. Troutt states he was called from New Jersey by a Mr. Howard, who said he was working for incumbent management. In response to Howard's inquiry, Troutt stated he had received the white proxy being solicited by the plaintiffs' Committee but not the blue management proxy. Howard sent him one and at Howard's request he signed and dated it December 14, 1971, and returned it.

Defendant Widmark, Butler's board chairman, states in an affidavit that plaintiffs' charge had been submitted to the S.E.C., which had requested Butler's secretary to review all proxies received by management as of November 30, 1971. Six proxies dated December 14, 1971 were found. Four are proxies of Butler executives who are actively soliciting for management, the fifth is that of a Butler executive apparently not soliciting proxies, and the sixth is that of a stockholder not involved in management. Defendants state that none of these proxies will be voted unless properly substituted with currently dated proxies and instructions to all solicitors not to accept post-dated proxies have been reinforced. In view of this assurance no injunctive relief is required.

### Rule 14a–9(a) Violations Claimed by Defendants

■ Just as strenuously as plaintiffs, defendants claim that the Committee's proxy material is riddled with omissions of fact and false or misleading statements which violate Rule 14a–9(a). In sum, defendants' principal objections assert essentially that plaintiff Dopp has not accurately set forth the true facts of the corporate transactions which are involved in the New Jersey lawsuit between Butler and Dopp.

The difficulty with defendants' contentions is that these very issues are already in litigation in the New Jersey Superior Court, the forum chosen by defendants for a plenary trial on the merits. It would be presumptuous for this court to attempt to unravel the complicated facts on largely conflicting affidavits after the New Jersey court has rendered a decision holding that "It is clear that the affidavits and depositions do raise sharp issues of fact which the Court conceives can be determined only on a plenary hearing."[7]

For this reason and the other considerations already noted, it would be inappropriate to grant defendants injunctive relief in these circumstances.

### Defendants' Cross-Motion for Relief Based on Violation of Section 13(d) of the Act

■ Plaintiffs concede that between February 1970 and August 1971 plaintiff Dopp was subject to the filing requirements of Section 13(d) of the Act, 15 U.S.C. § 78m(d), and that he failed to comply with those requirements.[8]

---

6. Rule 14a–10. Prohibition of Certain Solicitations

No person making a solicitation which is subject to §§ 240.14a–1 to 240.14a–10 shall solicit:

(a) any undated or post-dated proxy, or

(b) any proxy which provides that it shall be deemed to be dated as of any date subsequent to the date on which it is signed by the security holder. (17 C.F.R. 240.14a–10.)

7. Butler Aviation International Inc., et al. v. Paul S. Dopp, et al., Superior Court of New Jersey, Chancery Division, Bergen County, Docket No. C–3356–70, Steno. Tr. of Decision of Hon. Eugene L. Lora, J.S.C., November 9, 1971, p. 61. (Order to Show Cause herein, Exh. 20, p. 61.)

8. Section 78m(d) provides:

(1) Any person who, after acquiring directly or indirectly the beneficial own-

That statute, commonly known as the Williams Act, provides in substance that a person acquiring beneficial ownership of more than 5% of a class of registered securities shall within ten days thereafter inform the S.E.C., the issuing corporation, and each stock exchange where the security is traded, of that fact by written statement containing such additional information as the S.E.C. regulations require.

Plaintiffs regard this violation as "technical" and contend that defendants can establish no irreparable harm justifying their request for a preliminary injunction. They argue that Butler cannot claim it was unaware of Dopp's stock acquisitions while he was part of its management, and that after his resignation in January 1971 they were known from various other sources available to Butler, including his Schedule 14B filings.

Defendants contend most persuasively that the very purpose of the Williams Act was to prevent the attempted takeover of publicly-owned corporations by means of surprise tactics such as the suddenly announced cash tender offer or other secret acquisitions of large blocks of voting stock.[9]

Plaintiffs' moving papers admit that after his resignation from management in January, plaintiff Paul S. Dopp acquired a total of 59,700 shares of Butler voting stock, as follows:

| April 8, | 1971 | 40,000 | shares |
|---|---|---|---|
| June 22, | " | 200 | " |
| June 29, | " | 15,000 | " |
| August 12, | " | 2,000 | " |
| August 16, | " | 2,500 | " |

Prior to any of the foregoing acquisitions, Dopp admittedly already owned well in excess of 10% of Butler's voting stock. As of June 29, 1971, he had acquired an additional 55,200 shares, in itself more than the 5% acquisition which triggers the prompt information filing required by Section 13(d). Had he complied with the filing requirement he would have had to disclose information generally similar to that required of one proposing to make a tender offer; e. g., the background and identity of the purchaser, the source of his funds, the number of shares acquired, any contracts or arrangements with respect to the securities of Butler, and any plans he had to make major changes in Butler's business or corporate structure.

Defendants point out with some force that prompt filing by Dopp would have obliged him to immediately disclose not only the purchase but the source of the funds utilized to make the purchase. It would have allowed management to appropriately comment to the corporation's stockholders in the manner the statute was designed to permit, as soon as the

---

ership of any equity security of a class which is registered . . ., is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors

.　　.　　.　　.　　.

The statute also provides that a group of two or more who act "for the purpose of acquiring, holding, or disposing of se-

curities . . . shall be deemed a 'person'" (15 U.S.C. § 78m(d) (3)), and that it does not apply to acquisitions not exceeding 2% of the security class during the preceding twelve months. (Subsection (6) (B).)

9. Plaintiffs do not question defendants' standing to sue for a violation of Section 13(d). Defendants point out that standing has been sustained in a case involving counterparts of 13(d), namely, Section 14 (d), (e) and (f) of the Act, which were enacted at the same time. Electronic Specialty Co. v. International Controls Corp., 295 F.Supp. 1063 (S.D.N.Y.1968), aff'd in part, 409 F.2d 937 (2 Cir. 1969). See also Bath Industries, Inc. v. Blot, 427 F.2d 97 (7 Cir. 1970), aff'g 305 F.Supp. 526 (E.D.Wis.1969).

purchase was made. Stockholders and management would have been alerted at once to Dopp's move to regain control, as mandated by Section 13(d). Such a disclosure would also have prevented Dopp from concealing his purchases through the use of nominees so that his ownership would not appear on Butler's stock transfer records. His Schedule 14B filing made on October 18, 1971, can hardly be considered a substantial compliance with or an adequate substitute for the information required by Section 13(d).

The court cannot accept plaintiffs' contention that taking Section 13(d) seriously in this case would hinder the ability of shareholders even to speak to each other with respect to corporate affairs or to criticize an inefficient management. Rather it agrees with the salutary and meaningful analysis of the Williams Act stated in Bath Industries, Inc. v. Blot, *supra:*

> The purpose of the filing and notification provisions is to give investors and stockholders the opportunity to assess the insurgents' plans *before* selling or buying stock in the corporation. It additionally gives them the opportunity to hear from incumbent management on the merit or lack of merit of the insurgents' proposals. If the defendant-appellant's late filing is sufficient, then no insurgent group will ever file until news of their existence and plan leaks out and prompts a law suit. By that time it will be too late to avoid the evils which the Williams Act is designed to eliminate. (427 F.2d at 113). (Emphasis the Court's.)

Here we are not faced with subtle problems which have seemingly resulted in divergent views regarding application of Section 13(d) to group action. Here we are only concerned with admitted statutory violation by a large stockholder, once part of the management of a corporation, who determined on his own to launch a campaign to regain control. In doing so he has clearly plunged the corporation into a costly proxy contest it can ill afford—one which might have been avoided had early disclosure of his plans been made.

If Section 13(d) means anything, plaintiff Dopp should not be permitted to gain advantage from a course of action pursued in clear violation of law. At the very least, considerations of equity demand that Dopp be disenfranchised from voting at the December 14th meeting those shares he acquired after January 4, 1971, in excess of the 2% exemption provided by the Williams Act. See Ozark Air Lines, Inc. v. Cox, 326 F.Supp. 1113 (E.D.Mo.1971).[10]

More sweeping relief, which defendants urge, would be punishment, not equity, since it would deprive Dopp of previously acquired voting rights on a retroactive basis without good reason. Moreover, it is reasonably clear that the plaintiff Committee was formed after Dopp acquired the additional 5% of Butler stock he failed to report under Section 13(d). Hence there is no reason to grant the relief sought by defendants, which would enjoin the much less than 2% of Butler shares acquired by plaintiffs Anstatt, Cohen and Hickey, on the theory that they are charged with the 5% previously acquired by Dopp. For this same reason there is also no need to consider further plaintiffs' contention that they should be entitled to relief against defendants as a management group because their stock and stock options aggregate more than 5%, and they have not complied with Section 13(d).

Accordingly, it is ordered that (1) plaintiffs' motion for a preliminary injunction be denied in all respects, and

---

10. In the *Ozark* case, *supra,* where a group acquisition did not exceed the 2% limit for non-reporting, the court expressly stated:

> Had there been no 13(d) filing before this litigation commenced, and had there been evidence of acquisitions in excess of the 2% exemption, this Court might have considered as an appropriate remedy disenfranchising all shares acquired by the Group in excess of the 2% exemption in violation of the Williams Act.

(2) defendants' cross-motion for a preliminary injunction be granted only to the extent of enjoining plaintiff Paul S. Dopp from voting those shares of Butler's stock he acquired after January 4, 1971 in excess of 2% of the total of each class of security outstanding.

Settle order on notice.

## APPENDIX

| Court Exhibit No. | Description |
|---|---|
| 1 | Butler press release dated November 10, 1971, captioned "Butler Aviation Sues Former Chief Executive for Misuse of Corporate Funds; Seeks $600,000 plus Damages; Annual Stockholders Meeting Set for December 14" |
| 2 | *Wall Street Journal* article dated November 11, 1971 captioned "Butler Aviation Suing its Former Chairman, Who's Challenging Firm"; and *New York Times* article dated November 11, 1971 captioned "Butler Aviation Charges Ex-Chief Misused Funds" |
| 3 | Butler letter to stockholders dated November 13, 1971 |
| 4 | Butler Annual Report, 1970 |
| 5 | Butler proxy |
| 6 | Butler Notice of Annual Meeting of Stockholders, dated November 13, 1971, and Proxy Statement |
| 7 | Butler press release dated November 14, 1971, captioned "Butler Aviation Notifies Shareholders that 'Monumental Conflict of Interest' is Involved in Proxy Contest by Dissident Former President" |
| 8 | Proxy Statement of Committee for New Management of Butler Aviation, dated November 15, 1971 |
| 9 | *New York Times* article dated November 16, 1971 captioned "Butler Aviation Sees Conflict of Interest in Proxy Battle" |
| 10 | Committee for New Management of Butler Aviation letter to Butler stockholders dated November 22, 1971 |
| 11 | Butler letter to stockholders dated November 26, 1971 |