**Paul S. DOPP, Plaintiff-Appellee,**

**v.**

**FRANKLIN NATIONAL BANK,**
**Defendant-Appellant,**
**and**
**Butler Aviation International, Inc., et al.,**
**Defendants.**

**No. 606, Docket 71–2214.**

United States Court of Appeals,
Second Circuit.

Argued April 5, 1972.

Decided May 30, 1972.

874

Milton Kunen, New York City (Sidney Kwestel, Theodore J. Fischkin, Kaye, Scholer, Fierman, Hays & Handler, New York City, of counsel), for defendant-appellant.

Robert W. Gottlieb, New York City (Rosenman, Colin, Kaye, Petscheck, Freund & Emil, New York City, of counsel), for plaintiff-appellee.

Before CLARK, Associate Justice,* LUMBARD and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

This appeal presents another example of the burgeoning impact of the federal securities laws on the courts. Paul S. Dopp, the largest individual shareholder of Butler Aviation International, Inc.,[1] has used § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder as a wedge to block the sale of 51,500 shares of Butler stock pledged by him to Franklin National Bank as collateral for a loan of $380,000. Ordinarily, this action, which involves little more than a dispute between a debtor and creditor over the disposition of collateral upon default, would be grounded on alleged violations of state commercial or contract law. But Dopp, asserting that Franklin had misrepresented to him that he would have a right of first refusal on any sale arranged by Franklin and that Franklin failed to disclose that it was negotiating for the sale of shares, obtained a preliminary injunction from Judge Brieant restraining Franklin from honoring an option to purchase the shares which Franklin had granted to John and Michael Galesi. Judge Brieant granted this preliminary injunction without holding any evidentiary hearing, relying solely on the affidavits and depositions submitted by the parties.[2] Franklin has appealed. We cannot agree with Judge Brieant that Dopp established a likelihood of success on the merits of his 10b–5 claim or that he will suffer irreparable injury if the shares are sold pursuant to the option agreement. Accordingly, we reverse. This result, contrary to the implications of the dissenting opinion, in no way turns upon our views of plaintiff's wisdom in pursuing his claims under the federal securities laws.[3] We rely solely on established principles of equitable remedies and standards of appellate review. Our extended discussion, due in no small measure to the broadside attack by our dissenting brother, should not indicate that we consider this a novel case or,

---

* United States Supreme Court, retired, sitting by designation.

1. Dopp is the beneficial owner of over 190,000 shares of Butler, or more than 18% of the stock outstanding. All but approximately 20,000 shares have been pledged as collateral.

2. Dopp previously had obtained a temporary restraining order from Judge Gurfein.

3. Our dissenting brother apparently fears that we would undermine the Supreme Court's decision in Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), before the ink is dry. Suffice it to say, we do not suggest that the preliminary injunction should not have issued because Dopp failed to state a claim upon which relief could have been granted. Certainly our dissenting brother would not suggest that Justice Douglas's warning in *Bankers Life* that "Section 10(b) must be read flexibly, not technically and restrictively" relieves a plaintiff who is seeking either preliminary or permanent relief of his traditional burden of proof.

indeed, one where the result was ever in doubt.

The facts, which present the intriguing story of a shareholder fighting foreclosure so that he could retain leverage in a proxy contest, are essential to this appeal which hinges in the final analysis on the weighing of equities.[4] On July 17, 1969, Dopp borrowed $380,000 from Franklin, executing a demand promissory note secured by a pledge of 51,500 shares of Butler common stock.[5] At that time (and until January, 1971) Dopp was the President and Chairman of the Board of Butler, a Delaware corporation whose stock is traded on the American Stock Exchange. The promissory note, which included the pledge agreement, provided that upon any default of the borrower the bank could "forthwith sell, assign, give option or options to purchase, and deliver any and all securities" pledged as collateral. The note further provided that "no waiver whatsoever [of the bank's rights] shall be valid unless in writing, signed by the Bank, and then only to the extent therein set forth."

By July, 1970, although Franklin had been pressing for repayment, Dopp still owed $351,000 in unpaid principal. On July 14 Dopp presented a plan whereby he would repay Franklin in full by August 15 out of the proceeds of a $2,500,-000 advance he expected from a Swiss company. But, not untypical of the many promises he would make to Franklin, Dopp did not meet this self-imposed deadline. At this point, Franklin trans- ferred collection responsibility from its commercial loan department to its euphemistically termed "salvage" department, and when Dopp made only a few small partial payments in the ensuing months,[6] Franklin secured a default judgment against Dopp on December 16, 1970, for $369,447.61.

The very next day Dopp and Franklin entered into negotiations which ultimately resulted in a written stipulation, signed by both parties on January 20, 1971, providing that Dopp would have until February 26 to pay Franklin the reduced sum of $325,045.25 plus interest at the rate of $7\frac{1}{2}\%$ from the date of judgment. If the stipulated amount was not repaid, the judgment was to become immediately enforceable. In return, Dopp executed as additional security second mortgages on two Pepsi-Cola bottling plants he owned in Michigan.[7] But once again Dopp failed to meet his obligation and by May 14, 1971, he had made only sporadic payments totaling $20,000.

In late May, after G. Norman Widmark, the new Chairman of Butler, informed Franklin that Dopp's shares were no longer control stock, Franklin decided to sell the 51,500 shares. Bruce Sutherland, the Franklin vice-president who had been overseeing the Dopp account, began negotiating with John and Michael Galesi.[8] The Galesis apparently were friends of Widmark and had made investments with him on previous occasions. On June 15, 1971, Franklin gave Dopp formal written notice that it in-

---

4. Our dissenting brother dwells at length on the conspiratorial aspects of the complaint—i. e., the allegations that Franklin conspired with Widmark, the Galesis and Butler to deprive Dopp of his Butler shares. He uses "conspiracy" to suggest some sort of "dirty business". It reminds us of the prosecutor who adds a conspiracy count to "strengthen" an otherwise weak case. See Harrison v. United States, 7 F.2d 259, 263 (1925) (L. Hand, J.: "Conspiracy, that darling of the modern prosecutor's nursery."). It is of interest that the district judge did not rely on any so-called "conspiracy."

5. The loan was one of a series of loans for more than $1,190,000.

6. Dopp's check of October 29, 1970, in the amount of $10,000 was returned on initial presentment because of insufficient funds.

7. There is some dispute as to whether Dopp also agreed to give Franklin a mortgage on his yacht.

8. Sutherland previously had determined that the shares could not be sold in large blocks on the open market without breaking the "thin" market for Butler stock. He also decided as a matter of policy that it was too risky to sell the stock on the open market over an extended period of time.

tended to sell the shares at a private sale on or after June 25.

Just as he was spurred to action by the default judgment entered the previous December, Dopp again sought to buy time from Franklin. Accordingly, on June 28 he and Sutherland reached an oral agreement whereby Franklin would not sell the Butler shares if Dopp made a $20,000 payment in four days (July 2), delivered an additional 10,000 shares of Butler stock as collateral and made arrangements for the sale of all the Butler shares by July 21. Although Dopp paid the $20,000 (but not until July 26 instead of July 2), he never posted the additional collateral, nor did he make any arrangements for the sale of the 51,500 shares.[9]

The foregoing facts are virtually undisputed. The factual dispute with which we are concerned and which is the crux of this action grows out of an August, 1971, telephone call. After hearing from an obviously misinformed source that Franklin actually had sold the shares, Dopp immediately telephoned Sutherland, who assured him that this was not the case. Dopp claims, however, and so stated in his deposition, that Sutherland also gave him oral assurance that before Franklin sold the shares, it would give him the opportunity to produce a third person of his choice who would be ready to purchase on the same terms available to Franklin for the disposition of the stock, or, in the alternative, it would permit him to redeem the shares himself at the same price. He admits that Sutherland did not agree to any time period within which he would have to exercise this alleged right of first refusal, but says that he assumed "it would be a reasonable period of time,

at least a few hours . . . ." Sutherland vehemently disputes any such agreement. Indeed, he testified in his deposition:

"Q. I don't understand. Nowhere in these entries [in Franklin's Credit File] is it stated that Mr. Dopp told you in the event you were going to sell the shares he would arrange for the purchase.

Now, just show me where it says that. A. It doesn't say that in here because I never agreed to anything like that."

In the meantime, negotiations between Franklin and the Galesis continued, culminating in a written option agreement dated September 21.[10] One week later Franklin advised Dopp of this agreement, but did not disclose the names of the third parties. (Sutherland, on instructions from the Galesis, never had informed Dopp that he was negotiating with them.) Dopp instituted this action in the Southern District of New York on October 12, against Franklin, the Galesis, Widmark and Butler, primarily seeking rescission of the option agreement and an unspecified amount of damages. As his brief before this Court characterizes it, the amended complaint asserts essentially three claims: that Franklin's misrepresentation concerning his right of first refusal and its failure to disclose that it was negotiating with the Galesis violated § 10(b) of the Securities Exchange Act and Rule 10b–5; that the option agreement violated § 7 of the Securities Exchange Act and Regulation U thereunder which establishes margin requirements; and that Franklin, in entering into the option agreement, did not act in a "commercially rea-

9. The dissenting opinion stresses Dopp's continuing partial payments, while it conveniently underplays his repeated failures to meet his obligations.

10. The Galesis were granted a 60-day option to purchase the shares for $281,000 (approximately $5.45 per share), payable as follows: $17,500 paid immediately, $32,500 paid upon exercise of the option, and $231,000 plus interest paid over a period of five years. Dopp's account was to be credited with the entire amount, and the $17,500 was to be retained irrespective of whether the option was exercised.

sonable" manner in violation of § 9–504 of the Uniform Commercial Code.[11]

On October 18 Dopp moved for a preliminary injunction, alleging that he would be irreparably injured if the sale to the Galesis were consummated because he was involved in a proxy fight with Butler management and the share "could mean the difference between victory and defeat." Judge Brieant, although he did not hold an evidentiary hearing, found that "plaintiff shows reasonable probability of success" on his securities claim and that he would suffer irreparable injury because the block of Butler stock is "unique" and has "no ascertainable market value." Accordingly, he issued his preliminary injunction on November 19.[12]

## I.

It is axiomatic that because a preliminary injunction is a drastic remedy, it will not be granted unless the plaintiff can make a clear showing of probable success. *See, e. g.,* Intercontinental Container Transport Corp. v. New York Shipping Ass'n, 426 F.2d 884, 887 (2d Cir. 1970); Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). On the record as we review it, Judge Brieant was not justified in concluding that Dopp made the requisite showing of probable success.[13]

Before considering the basis for this conclusion, we refer briefly to our

11. The amended complaint differed from the original complaint primarily in that it added Franklin's failure to disclose information about negotiations with the Galesis as another basis for his securities law claim and the separate state law claim under the Uniform Commercial Code. Dopp claims that he did not know of Franklin's failure to disclose until Sutherland was deposed.

12. On the same day, the Galesis exercised their option to purchase the shares at $5.45 per share, although the shares were then selling at $4.75 per share on the American Stock Exchange. We have been informed that the transfer will be consummated if the injunction is dissolved. Butler stock is now selling at approximately $12 per share.

13. We assume for purposes of this appeal, but do not decide, that Dopp has standing to assert a claim under Rule 10b–5 as the beneficial owner of the pledged shares. Whether a debtor who pledges stock to secure a loan retains an interest sufficient to classify him as "seller" even after he has defaulted in repayment of the loan and a court judgment has been obtained against him is a difficult question. Similarly, whether Dopp's allegation that he had been promised a right of first refusal for the stock might give him standing as an "aborted purchaser" has not been considered upon this appeal. These questions remain open for consideration by the district court.

Dopp argued before this court that he was likely to succeed on both his claim under § 7 of the Securities Exchange Act of 1934 and Regulation U promulgated thereunder and his claim under the Uniform Commercial Code. Judge Brieant did not base his decision on either ground, and neither of the claims can withstand scrutiny at this stage of the proceedings. Although Regulation U at the time the option was granted imposed a margin limitation of 35%, 12 C.F.R. § 221.3(i) provides that the regulation shall not prevent "a bank from taking such actions as it shall deem necessary in good faith for its own protection." There is no evidence that Franklin was not acting in this manner. Moreover, there is some doubt that Dopp, who was not the purchaser under the option, has standing to assert a violation of Regulation U. *Compare, e. g.,* Natkin v. Exchange National Bank of Chicago, 342 F.2d 675 (7th Cir. 1965).

Section 9–504 of the Uniform Commercial Code requires a secured party, if he is going to foreclose on collateral, to dispose of the collateral in a "commercially reasonable" manner. Although Judge Brieant stated that he found on the whole record "at least some suggestion to the effect that defendant Franklin is not acting in a 'commercially reasonable' manner," he did not indicate on which part of the record he relied, and we cannot find any evidence to support the alleged violation of § 9–504. Franklin gave notice of the intended private sale as required by the Code, § 9–504(3), and there is no allegation that the collateral was sold for less than its true value.

We emphasize, however, that Dopp on remand is free to introduce evidence to establish any of the claims asserted in his complaint, and that our statements re-

role as a reviewing court. Our dissenting brother is quick to point out that the district judge's findings "are not to be disturbed unless found to be clearly erroneous." This is not a case, however, where there was an evidentiary hearing below and the credibility of witnesses played an essential part in the district judge's determinations. We are in as good a position as the district judge to read and interpret the pleadings, affidavits and depositions and thus have broader discretion on review. *See* Concord Fabrics, Inc. v. Marcus Brothers Textile Corp., 409 F.2d 1315, 1317 (2d Cir. 1969).

■ The linchpin of Dopp's argument is the alleged oral agreement granting him a right of first refusal.[14] In order to grant the preliminary injunction, the district judge must have assumed implicitly that Dopp would prevail in his unsupported claim that Sutherland entered into the agreement during the August telephone call. To do so, he had to reject Sutherland's claim, equally as strong, to the contrary. Generally, of course, a judge should not resolve a factual dispute on affidavits or depositions, for then he is merely showing a preference for "one piece of paper to another." Sims v. Greene, 161 F.2d 87, 88 (3d Cir. 1947). This is particularly so when the judge, without holding an evidentiary hearing, resolves the bitterly disputed facts in favor of the party who has the burden of establishing his right to preliminary relief. *See id.;* 7 Moore, Federal Practice § 65.04 [3]. This caveat is most compelling "where everything turns on what happened and

that is in sharp dispute; in such instances, the inappropriateness of proceeding on affidavits attains its maximum . . . ." Securities and Exchange Comm'n v. Frank, 388 F.2d 486, 491 (2d 1968) (Friendly, C. J.). In this case, where all stands or falls on Dopp's claim, denied by Sutherland, that an oral agreement was made in August giving him a right of first refusal, an evidentiary hearing was essential to resolve the credibility gap.

■■ Dopp maintains, however, that Franklin waived its right to a hearing because it did not insist on one. It is true that we have held that a defendant who joins "the battle of affidavits with as much relish as the [plaintiff]" should not be heard to complain when the decision is adverse. Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir. 1970). We reaffirm that principle here, but even where a party can be deemed to have waived his right to a hearing, the movant is not relieved of his burden of establishing a reliable factual basis for the preliminary injunction. 7 Moore, Federal Practice ¶ 65.04 [3], at 1641. Certainly, it could not be suggested that the parties could waive their right to a decision according to law and confer upon the district judge the power to decide by a toss of the coin. Unfortunately, Judge Brieant did not articulate any reasons for concluding that the victory belonged to Dopp; nor do we believe that he could have.[15]

■ In light of what we have stated, it is appropriate that we revert to our observation early in this opinion. Dopp's promissory note provided that Franklin

---

garding his likelihood of success on the merits based solely on the scanty record now before us should not deter a fresh and complete appraisal after hearing witnesses and a full trial on the merits.

14. Dopp also alleges that Franklin failed to disclose that it was negotiating with the Galesis. Unless there was an agreement granting Dopp a right of first refusal, we do not see how this nondisclosure could have injured him. Moreover, Dopp admitted in his deposition that

he knew that Franklin was negotiating for the sale of the securities and that he suspected the Galesis were the third parties.

15. Findings are not a jurisdictional requirement of appeal, but merely aid the appellate court in reviewing the decision below. In certain cases, however, the absence of findings can so obscure the basis for granting the relief below that reversal is called for on this ground alone. *See* SEC v. Frank, *supra*, 388 F.2d at 493.

would not be deemed to waive any of its rights, unless the waiver were in writing and signed by Franklin. Moreover, § 8–319 of the Uniform Commercial Code provides that a contract for the sale of securities is not enforceable unless it is in writing or there is a written memorandum by the party against whom it is to be enforced. Under these circumstances it is difficult to believe that Dopp, obviously an experienced investor and knowledgeable in the area of commercial transactions, would not have demanded that the crucial agreement upon which he relies, if there was one, be reduced to writing. The "agreement" is also cast in a cloud by Dopp's admission that he and Sutherland had not agreed on the time period within which Dopp could exercise the alleged right. Finally, Franklin's credit file with regard to Dopp's account, which meticulously lists all other agreements and transactions, does not make a single reference to the alleged agreement. Thus, if we were forced to reach any conclusion on the basis of the scanty record before us, we would be compelled to hold that Dopp failed to carry his burden on his application.

■ But, even if we were to assume that the parties had reached the oral agreement, we could not conclude on this record that Dopp made a showing before Judge Brieant, by clear and convincing facts, that he in all likelihood will prevail in establishing the elements of his 10b–5 claim. To succeed in a 10b–5 action, the plaintiff must prove that he relied upon a misrepresentation of a material fact to his detriment. *See, e. g.,*

List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). Thus, Dopp will have to establish that, but for the misrepresentation, he would have acted differently—in this case, that he would have redeemed the shares himself or found a third party to purchase them if he had been given the opportunity.[16] We know, however, that as late as July, Dopp had not done either.[17]

■ Nor are we prepared on this record to conclude that Dopp will be able to show that the alleged misrepresentation was material. As we stated in *List,* 340 F.2d at 462:

> The basic test of "materiality," on the other hand, is whether "a reasonable man would attach importance [to the fact misrepresented] in determining his choice of action in the transaction in question." Restatement, Torts § 538(2) (a); accord, Prosser, Torts 554–55; I Harper & James, Torts 565–66. Thus, to the requirement that the *individual plaintiff* must have acted upon the fact misrepresented, is added the parallel requirement that a *reasonable man* would also have acted upon the fact misrepresented.

In the face of the provision of the promissory note that all waivers by Franklin had to be in writing, it strains credulity that Dopp could have relied reasonably on the alleged oral agreement, or in terms of 10b–5, that any misrepresentation was material to his course of action.[18]

---

16. Dopp also claims that he relied on the misrepresentation in continuing partial payments of the principal due. One does not rely on a representation to his detriment, however, in performing a legal obligation. *See* Ryan v. J. Walter Thompson Co., 453 F.2d 444 (2d Cir. 1971); Williston, Contracts § 1515, at 477 (3d ed. 1970).

17. The affidavit of Herman Anstatt, sworn to on November 1, two days before argument of the motion, does not convince us otherwise. Although Mr. Anstatt stated

that he would have been willing on September 21 to purchase the shares on the same terms offered to the Galesis, he never gave Franklin a firm, irrevocable offer or tendered the purchase price. Moreover, there is no evidence that Dopp could have unearthed Mr. Anstatt on short notice during August. As it was, Mr. Anstatt's affidavit was not submitted for more than 10 days after Dopp's motion for the preliminary injunction.

18. There is the further question whether the misrepresentation has caused any in-

We reiterate here that we conclude only that Dopp has not shown, on the record before us on this appeal, that he likely will succeed on the merits below. This is not to say that we might not reach a different conclusion when presented with a full record after trial.

## II.

As with every rule we believe to be hard-and-fast, including those we consider elementary, exceptions occasionally are cut out. We are told that if there is an imbalance of hardships and the equities weigh heavily in favor of the movant, an injunction will issue to maintain the status quo *pendente lite* if "the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953). *See also Semmes Motors, Inc.*, 429 F.2d at 1204–1207. Dopp invokes this doctrine to support the decision below. Although we do not question Judge Brieant's conclu-

sion that Franklin will not suffer irreparable injury,[19] we cannot agree that Dopp's plight will differ materially from Franklin's if the injunction is dissolved.

In this connection, the district judge concluded that the Butler stock was "unique" because Franklin could not sell it in a block on the open market without severely depressing the market price. As a general proposition, shares traded on the open market are considered to have an ascertainable market value. *See, e. g.*, Simon v. Electrospace Corp., 28 N.Y.2d 136, 145–146, 320 N.Y.S.2d 225, 269 N.E.2d 21 (1971); 5A Corbin, Contracts § 1148. Although a purchase of 51,500 shares at this time or in the near future undoubtedly would require an outlay substantially in excess of the option price of $281,000, Franklin, if it has committed any Securities Exchange Act or state law violation, will be able to respond in damages. Moreover, Dopp has not shown that he could not purchase an additional 51,500 shares on the open market or in a private transaction[20] if he eventually is the successful party. If would appear, therefore, that Dopp's inability to prove irreparable injury[21] is

jury. We have been presented with a substantial dispute, involving technical considerations of New York contract law, concerning the enforceability of the alleged oral argeement. If Dopp never could have exercised a right of first refusal even had he known of the impending option agreement with the Galesis, presumably he can show no damage. It would serve no purpose at this stage, however, to embark on a long exposition and analysis of New York law.

19. The price of Butler stock approximately has doubled since the date of the option agreement. If the 51,500 shares, now worth in the neighborhood of a half million dollars are not sufficient to protect Franklin against Dopp's debt (slightly more than $300,000), Franklin can protect itself through the second mortgages on the Pepsi-Cola bottling plants, which were pledged as additional collateral in January, 1971.

20. Apparently Dopp was able to acquire 55,000 shares in private transactions between April and June 1971. Committee for New Management of Butler Avia-

tion v. Widmark, 335 F.Supp. 146, 154 (E.D.N.Y.1971).

21. Dopp, of course, did not allege that he would not be able to purchase another 51,500 shares, but rather that the shares pledged to Franklin were essential to an impending proxy contest. Judge Brieant concluded that "it is difficult to conceive how a person against whom such a substantial unpaid judgment is outstanding, may successfully conduct a proxy contest for control of a publicly held corporation." We see no reason to disturb this conclusion, particularly in view of Dopp's subsequent defeat by more than 300,000 shares at the Butler election on December 14, 1971. Our dissenting brother argues that a bare assertion that 250,000 votes were challenged by Dopp should be sufficient to carry the day on the issue of irreparable injury. We assume, however, that if the challenges could have changed the outcome of the election, they would have been resolved.

Dopp also informed us on appeal that he might well "seek to oust this management [Widmark] at the next Butler

in itself sufficient grounds for reversing the grant of the preliminary injunction. *See* Foundry Services, Inc. v. Beneflux Corp., 206 F.2d 214, 216 (2d Cir. 1953).

For the reasons stated, the order of the district court is reversed, the preliminary injunction is vacated, and this case is remanded for further proceedings. In view of our disposition, it is suggested that the trial on the merits be expedited.

Mr. Justice CLARK (dissenting):

I regret that I cannot agree with my brothers for whom I have such high regard and affection. Believing, however, that their decision is wrong and will cause mischief in the Circuits, I am compelled to dissent.

This suit arises in the context of a long and heated struggle for control of Butler Aviation, a publicly held corporation, the stock of which is traded on the American Stock Exchange. Plaintiff Dopp is the largest single shareholder of Butler Aviation, holding, at the time of this action, 18 percent of the outstanding shares. Defendant Widmark is the present Chairman of the Board of Butler Aviation, having ousted Dopp from that position on January 8, 1971. When this action was filed and when it was decided by the district court, these men, with their various allies and financial supporters, were locked in a proxy battle for control with the December stockholders' meeting scheduled to be a decisive battleground. Dopp brought this action charging that Widmark, his partners, the Galesi brothers and Franklin National Bank had conspired to deprive Dopp of his rights to own and control 51,500 shares of Butler stock, one-third of Dopp's holdings. The conspiracy took this form: Widmark and his partners, the Galesis, in their struggle to continue their control, sought to weaken Dopp's position by depriving him of Butler Aviation stock that he had pledged on loans at various banks in the New York-New

Jersey area. Franklin National Bank was one of the banks they contacted in this regard. It held 51,500 shares of stock as collateral for a past due debt of Dopp. The Bank was to give an option to buy the stock at foreclosure to the Galesis, depriving Dopp of his right to redeem or exercise a first refusal to either purchase the stock himself or supply his own nominee to purchase it. To prevent this option from being consummated, Dopp asked the district court for a temporary injunction to enjoin the sale. The district court granted this temporary relief. The court today reverses the district court holding that it should have allowed the sale to be consummated. I cannot accept this result for it disturbs established precedent in at least five respects:

(1) The court's indication that this conspiracy might not be attacked under Rule 10b–5 is clearly contrary to the Supreme Court's holding in Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), as well as decisions of other panels of this court. Vine v. Beneficial Finance Co., 374 F.2d 627 (2 Cir.), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967). See also Herpich v. Wallace, 430 F.2d 792 (5 Cir. 1970).

(2) The court's apparent holding that an evidentiary hearing "was essential" is inconsistent with this court's decision in Semmes Motors Inc. v. Ford Motor Co., 429 F.2d 1197 (2 Cir. 1970). None of the parties called for such a hearing but implicitly agreed that the issue of the entry of a temporary injunction pendente lite be decided on the pleading, the affidavits, some 350 pages of depositions, 40 pages of exhibits and over 160 pages of briefs.

(3) The court's reversal, based on *its* finding that Dopp did not make "a clear showing of probable success" on the merits, repudiates a line of cases holding that such a showing is not required when the balance of potential harm fa-

shareholder meeting" which was scheduled for May 1972. Since the injunction

was in effect throughout May, our decision cannot affect his effort.

vors one party and the other party will not suffer irreparable harm. Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738 (2 Cir. 1953) (Frank, J.); *Semmes Motors Inc., supra.*

(4) The court reverses simply on the basis that it has a different view of the facts although, under the rule adopted in myriad cases, findings of a district judge on a temporary injunction are not to be disturbed unless found to be clearly erroneous. Developments in the Law, 78 Harv.L.Rev. 994, 1071–72 (1965).

(5) The majority overturns the findings of the trial court on irreparable injury. This is done despite the detailed findings of the trial judge: (a) that the stock was unique and of vital importance to Dopp and (b) that money damages would be wholly inadequate compensation since the value of this specific block of shares was unascertainable.

## I.

*The Facts:*

Over several years, Dopp had obtained a series of loans from the Franklin National Bank totalling in excess of $1,050,000 and had paid them in full except for the loan here which was secured by the 51,500 shares of Butler Aviation. In December 1970 a judgment of $369,447.61 was obtained by the Bank on this indebtedness but by agreement execution on it was suspended until February 26, 1971, and the indebtedness was reduced to $225,045.25 with interest at 7½ percent. Although Dopp did not pay the entire debt on its due date, he did make partial payments and did furnish additional collateral for the note over and above the Butler Aviation shares in the form of mortgages on two Pepsi-Cola bottling plans of the estimated value of $400,000 to $600,000 (i. e. far in excess of the full indebtedness).

Prior to May 26, 1971, the Franklin Bank had made no effort to sell Dopp's stock, although it had on November 8, 1970, without advising Dopp, transferred it on the Butler Aviation stock register from his name to Franklin Bank's nominee, Colat Company. Instead of foreclosing on the stock, it had been accepting partial payments from Dopp who from September 1, 1970 to May 26, 1971, had paid $105,000 on the indebtedness. On the latter date Widmark, the new Chairman of the Board of Butler Aviation, contacted Sutherland of the Franklin Bank and "informed" him that Dopp's shares were no longer control stock and could thus be disposed of without violating federal security laws. He also "informed" the Bank that the Galesi brothers were interested in purchasing the Dopp Butler Aviation stock then held as collateral by the Franklin Bank. The latter then decided to liquidate Dopp's stock. Sutherland contacted the Galesi brothers, as Widmark had suggested. He carried on a series of conversations with them over the next few months concerning their acquiring the Dopp stock. At the request of the Galesi brothers, Sutherland did not tell Dopp of these negotiations although Dopp specifically inquired about the same. By June 9, 1971, these secret negotiations reached the point of a firm offer by the Galesis of $5 a share with $57,500 cash and $200,000 in notes secured by the Dopp stock and guaranteed by the Galesi brothers. Sutherland reported that "Dopp was due in from England today and in the meanwhile I shall attempt to stall Galesi with respect to our providing notice to Dopp of our intended sale." However on June 15, 1971, the Franklin Bank gave written notice to Dopp of its intent to sell, a private sale, his Butler Aviation stock to collect on his debt. No mention was made in the letter of the Galesis and June 25th was its deadline. However, on June 30th Sutherland agreed to stand by until July 21, 1971, on payment of $20,000 and the additional security of 10,000 shares of Butler Aviation stock. Although Dopp did not pay the entire amount promised nor furnished the additional security, he did pay $10,000 on July 7 and two additional payments of $5000 each by July 26th. About this time Dopp heard from another banker that his stock had been sold by Franklin Bank. He called Suth-

erland and was assured that the stock had not been sold and Dopp claims that, in addition, Sutherland promised to give Dopp a right of first refusal on the stock or permit Dopp's nominee to buy it on the same terms that the Franklin Bank might be offered. Dopp continued to pay on the debt, and from June 15 to September 22 paid a total of $30,000, the last payment of $5000 being made on the very day that Sutherland secretly signed an option to sell the stock to the Galesis. The total consideration for the sale as provided in the option was "$5.46 a share or a total of $288,000, with $50,000 cash and the balance $12,500 quarterly after the first year at 6 percent interest."[1] The $231,000 balance was to be secured by the Dopp stock. The Franklin Bank's attorneys advised Sutherland that he could accept Dopp's payments and that the contemplated transaction (with the Galesis) was legally unassailable despite the acknowledgment of Franklin Bank of its fiduciary relationship with Dopp, its intent to foreclose on his stock when it accepted the payments and its keeping of the entire transaction a secret from Dopp, not advising him of it until October 1, 1971. He immediately insisted on his right of first refusal, insisted that the Franklin Bank's agreement with the Galesis was not as secure as the one it had with him, the collateral being greater (the two Pepsi Cola plants), the interest 1½ percent higher and his cash payments larger during the previous year ($140,000), and tendered his own nominee, Herman E. Anstatt, Jr., Chairman of the Midland Bank and Trust Co., who agreed to buy the stock from Franklin Bank on the same terms as the Galesis' option.

The record also shows that Sutherland made no effort to seek out purchasers for the Dopp stock, save the Galesis; that while he called one stock broker and was advised that the block of stock (51,500 shares) was so large that it could not be sold without depressing the market, he never sought the advice of experts. Indeed, Sutherland admitted that he had no experience in handling large blocks of stock such as Dopp's.

In addition, as the district court found in its 8-page printed opinion, Franklin Bank was the transfer agent of Butler Aviation. It also did a substantial banking business with Butler Aviation and had extended a million dollar line of credit to it. At the time of this transaction, Butler Aviation owed Franklin Bank about a half million dollars. Moreover the Bank did not intend to foreclose its lien on Dopp's stock until after Widmark's call. Furthermore, Widmark and the Galesis were partners in other transactions and the option to the latter was made without any financial investigation by the Bank. Finally, in the proxy battle over control of Butler Aviation, Franklin Bank had Colat Co., its nominee, vote Dopp's shares in favor of Widmark. The majority makes much of the loss of this battle by Dopp but they do not mention that 250,000 of the votes were contested. If they were not legal and Dopp's shares held by the Bank were cast against Widmark, the latter would have lost the proxy battle, since his margin was only 300,000 shares. The majority suggests that Franklin Bank was merely acting as would any creditor with collateral on a past due obligation. The trial judge found to the contrary. I submit the undisputed facts indicate that Franklin Bank's action was nothing less than an assist to the Galesis and Widmark forces in continuing their management. Such a situation does not jibe with its fiduciary obligation to Dopp.

II.

*Rule 10b–5 Applies:*

Rule 10b–5 provides that it shall be unlawful for *any person* to make any untrue statement of a material fact or to

---

1. The terms of the option given the Galesis appear to be in violation of the margin requirements of Regulation U. Plaintiff argues, with some merit, that he would have standing as a uniquely interested party to have the unlawful contract declared void. I do not reach this question since the district court did not rely upon it.

omit to state a material fact in connection with the purchase or sale of any security. It is undisputed that Sutherland "omitted" to inform Dopp that Franklin Bank was negotiating with the Galesis to sell his Butler Aviation shares. It is further admitted that Sutherland refused to inform Dopp that he intended to sell the stock to the Galesis. The district court found that Dopp was led by the Franklin Bank's concealment to "refrain from . . . arranging for the purchase of the Butler Aviation shares by others who might be more friendly to him than the Galesis." It follows that Rule 10b–5 applies. As Mr. Justice Douglas said in Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971):

> "The Congress made clear that 'disregard of trust relationships by those whom the law should regard as fiduciaries, are all a single seamless web' along with manipulation, investor's ignorance, and the like . . .. Since practices 'constantly vary and where practices legitimate for some purposes may be turned to illegitimate and fraudulent means, broad discretionary powers' in the regulatory agency 'have been found practically essential.' . . . . Hence we do not read § 10b as narrowly as the Court of Appeals; it is not 'limited to preserving the integrity of the securities market' . . . though that purpose is included. Section 10(b) must be read flexibly, not technically and restrictively. Since there was a 'sale' of a security and since fraud was used 'in connection with' it, there is redress under § 10(b), whatever might be available as a remedy under state law." At 11–12.

The obligations of Rule 10b–5 are placed on "any person who engages in such conduct," Chasins v. Smith, Barney & Co., 305 F.Supp. 489 aff'd, 438 F.2d 1167 (2 Cir. 1970). The obligation is also present because of the relationship of a pledgee to a pledgor. In re Kiamie's Estate, 309 N.Y. 325, 130 N.E.2d 745 (1955) and by the New York Uniform Commercial Code, Section 9–504 as well.

It requires that notice be given to a pledgor and that he has an absolute right to redeem under Section 9–506.

It is also clear that the concealment is "in connection with the sale of a security." The option with the Galesis is merely an agreement to sell Dopp's securities at foreclosure. The shares are still owned by Dopp and he is accordingly the seller and is protected under Rule 10b–5. Superintendent of Insurance v. Bankers Life & Cas. Co., supra, at 11, 92 S.Ct. 165; Vine v. Beneficial Finance Co., 374 F.2d 627 (2 Cir. 1967), cert. denied 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967).

### III.

*The Parties Waived an Evidentiary Hearing—None was Required:*

The majority complains again and again that no oral hearing was held to resolve the factual dispute between Sutherland and Dopp on the question of whether the latter was granted the right to meet any other proposal made to Franklin Bank. As is heretofore indicated, the pleading and affidavits were buttressed by several depositions as well as exhibits which gave the court a full picture of the controversy. The majority cites SEC v. Frank, 388 F.2d 486 (2 Cir. 1968), but this case is based on the failure to make findings of fact, not on the necessity of having oral testimony. Indeed, the court in *Frank* held that "if a party is unwilling to have the issuance of a temporary injunction decided on affidavits, he must make his objection known; he may not gamble on the judge's accepting his affidavit rather than his adversary's and then seek a reversal if the result is disappointing." *Id.* at 493 n. 6. The author of *Frank* has more recently expounded on this in *Semmes Motors, Inc., supra* at 1205, by capsuling "a party who chooses to gamble on that procedure cannot be heard to complain of it when the decision is adverse." The majority's citation of *Frank* here is also inapt since it dealt only with affidavits. Here the trial judge was able to examine extensive depositions, through which both sides had

opportunity to scrape away the superficial claims of their opponents and reveal the true conflict. The majority also cites *Frank* that the absence of findings in the district court may lead to reversal. There the court was faced with a conclusory two-liner. Here the district court has given us an 8-page opinion that adequately describes his view of the facts and the law; I see no deficiency here.

### IV.

*The "Probable Success" Issue*:

The court also says that Dopp must make "a clear showing of probable success" on the merits. In my view—as the district court found—Dopp did this. In any event, however, this is not an essential prerequisite to the granting of a temporary injunction. It is merely one factor to be weighed in the balance. See 3 Barron & Holtzoff, Federal Practice and Procedure, Section 1433, page 493 (Wright Ed. 1958). As was said in District 50 U. M. W. v. International Union U. M. W., 134 U.S.App.D.C. 34, 37, 412 F.2d 165, 168 (1969): "The likelihood of success on the merits that a movant for injunctive relief must demonstrate varies with the quality and quantum of harm that it will suffer from the denial of an injunction." See also Packard Instrument Company, Inc. v. ANS, Inc., 416 F.2d 943 (2 Cir. 1969); Unicon Management Corporation v. Koppers, 366 F.2d 199, 205 (2 Cir. 1966); Dino DeLaurentiis Cinematografica, S.p.A. v. D-150, Inc., 366 F.2d 373, 375 (2 Cir. 1966); Continental Oil Company v. Frontier Refining Company, 338 F.2d 780, 781–782 (10 Cir. 1964); B. W. Photo Utilities v. Republic Molding Corporation, 280 F.2d 806 (9 Cir. 1960). When the available evidence indicates that plaintiff is likely to suffer irreparable harm if the injunction is denied and defendant is likely to suffer little, if any harm if the injunction is granted, "affirmance of the temporary injunction does not depend on a holding that (plaintiff) had demonstrated a likelihood of success . . . ." Semmes Motors, Inc. v. Ford Motor Co., *supra,* at 1205 noted in Recent Develop-

ments, 71 Columbia Law Review 165 (1971):

"To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i. e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2 Cir. 1953). (Frank, J.).

See also Ohio Oil Company v. Conway, 279 U.S. 813, 815, 49 S.Ct. 256, 73 L.Ed. 972 (1929). If the opinion today means that Dopp must meet the same burden of proof in preliminary proceedings to gain a temporary injunction as is imposed at the ultimate trial on the merits it marks an unfortunate departure from sound precedent and will certainly hamstring the administration of a most important equitable remedy.

### V.

*The Findings Can be Overturned Only If Clearly Erroneous*:

The court reverses simply on its view of the facts. I submit that the review here of the trial court's decision is strictly limited. The test is whether the trial court abused its discretion and not whether the appellate court would have granted or denied the injunction. See 7 Moore Federal Practice Section 65.04(2) at page 1631, and Section 65.21 at page 1703 (1971). The trial court's function requires an equitable balancing of many factors, see 7 Moore, supra, Section 65.-18(3), and the trial court's findings are not to be disturbed here unless found to be clearly erroneous. See "Developments-Injunctions" 78 Harvard Law Review 994, 1070–1072 (1965). Under this standard I cannot say that the trial court erred in finding that a substantial question is presented by the evidence and that

irreparable injury is likely to result if the injunction is not granted.

The majority's decision in this case hinges on its conclusion that "it is hard to believe" Dopp's testimony. While the district court did not have the advantage of seeing and hearing the witnesses, I find the record clearly supportive of the trial court's conclusion that Dopp's proof is sufficiently credible to present questions that are "fair ground for litigation."

First, the depositions clearly present the unqualified statement of Dopp that Sutherland did make the promise and that Dopp relied upon it. His actions prior to the bringing of this suit are wholly consistent with his claim. Thus, throughout the period under consideration, Dopp continued to make partial payments of his debt even after the June 15 written notice of the Bank's intent to sell the collateral. Moreover, immediately upon learning of the option to the Galesis, Dopp, through his attorney, insisted on his rights as he claimed them to be, and offered his own nominee for the arrangement. Although this complete consistency between Dopp's claims and his actions is not conclusive, it certainly is supportive.

Secondly, reading Sutherland's testimony as a whole, it reveals his attitude throughout to be clearly evasive. This in itself casts serious doubt on his testimony. Although Sutherland did, after much sparring, deny making the promise which Dopp attributes to him, his earlier testimony evaded that question completely. For example, at page 108, when counsel asked whether he agreed not to sell the stock unless he gave Dopp the first opportunity to meet the terms of such a proposed sale, Sutherland said: "well he said that in the papers". Whereupon his counsel volunteers "he wants to know if you had that conversation in which that was said." Sutherland's answer to his counsel was "I had a conversation with Mr. Dopp and he asked me 'Do you still have . . .' how did he put it: I have been told that you sold the stock. Do you still have it? And I said (to Dopp) 'Yes, I do.'" It was not until the next day and over 200 pages later in the deposition that Sutherland finally denied making the agreement and even then his answers were marked by apparent discomfort:

"Q. Did Mr. Dopp ever tell you if you ever entered into a deal with someone, that he would like to know about it because he would buy the stock up at that time? A. He said he would like to know about it.

"Q. He didn't say he would buy the stock? A. He never said he would buy the stock. He said he could make some arrangement, and these arrangements are made in some of these file entries here, whereby he was going to sell Butler stock at $7 a share, $6 a share.

"Q. I don't understand. Nowhere in these entries is it stated that Mr. Dopp told you in the event you were going to sell the shares he would arrange for the purchase.

"Now, just show me where it says that. A. It doesn't say that in here because I never agreed to anything like that.

"Q. I didn't say you agreed to anything. That's a legal conclusion. I wouldn't even ask you that, sir. Don't spar. Answer my questions.

"Mr. Fischkin: Don't instruct the witness.

"Mr. Gottlieb: The witness will follow (185) the normal procedures in connection with a deposition and not get upset and we will have no problems.

"Mr. Fischkin: I think the witness has been calmer than you.

"Mr. Gottlieb: Counsel, I think it's inappropriate to make remarks about other counsel.

"Mr. Fischkin: I think it's inappropriate to make remarks about the witness.

The Witness: I'm sorry, may I have the question back?

(The question was read.)

"A. I don't believe it says that anywhere because as I indicated, I only put substantive matters in file entries.

"Q. But you do recall that Mr. Dopp said that to you on a number of occasions? A. I recall that he said that he would have someone doing that, not that he would do it.

"Q. It is your recollection that on a number of occasions Mr. Dopp stated that in the event you intended to sell the stock, he would arrange for the purchase; is that correct?

"A. He said this six or seven times, perhaps."

Moreover, Sutherland acknowledges that Dopp was continuing to make payments right up to the date of the option in order to avoid foreclosure. Surely, one can conclude from this that Sutherland was aware that Dopp believed the June 15 notice had been abandoned, as deadlines had always been in the past. In addition, Dopp was, of course, relying on the Sutherland promise to give him a first refusal before selling his stock.

The majority suggests that, as an experienced businessman, Dopp did not, would not, and should not rely on oral promises in these matters, insisting instead that the arrangement be reduced to writing. The whole history of negotiations between Dopp and the bank belies this notion. Since 1970 Dopp had paid over $700,000 on his debts in an occasional and erratic manner, frequently orally proposing and accepting new schemes to gain more time for payment, add additional security for his debts, etc. During all this time, the bank had refrained from foreclosing on any of his loans. Although neither party seemed wholly comfortable with its trading partner, each had accepted these frequent renegotiations of the terms, *almost always on an oral basis*. Even after the bank had obtained a judgment against Dopp, it did not foreclose on the property it held, but instead entered into another oral arrangement by which Dopp promised more collateral and the bank promised not to foreclose and to extend the time for payment.

The willingness to modify the arrangement orally is most clearly indicated in the period from June 1971 to October 1, 1971, when Dopp learned of the option for the Galesis. On June 15 the bank informed Dopp in writing that it intended to sell the stock. Within ten days, however, bank officials and Dopp's attorney orally negotiated new arrangements, by which the bank would not sell the stock and Dopp would make additional payments and post additional security. during these months, according to Sutherland's testimony, Dopp asked "seven or eight times" for assurances that the stock would not be sold without notice to him, Dopp continued to make payments, and, apparently, nothing was said about the June 15 notice. From an actual count the Franklin Bank agreed orally during the period September 1970 through September 1971 14 times to delay the due date on the indebtedness here. Only one time was such an agreement put in writing. In view of this rather casual approach to Dopp's obligations, his insistence on a written agreement would be unusual and unnecessary.

The majority also suggests that Sutherland's "meticulous" note-making did not indicate that the alleged promises were made. I find this absence, under the circumstances of this case, almost wholly immaterial and certainly not, as the majority suggests, conclusive of the issue. Sutherland's ledger is filled with his personal notes on Dopp's promises. It is but a one-sided account of Sutherland's recollections and was clearly not intended by the parties to embody the ever-changing due date on Dopp's indebtedness that would be binding on the bank and Dopp. Indeed the notations were never seen by Dopp. Moreover, Sutherland admitted that he did not record every conversation with Dopp in his file; we know, for example, that he did not record the "seven or eight" times Dopp asked for a first call on the stock. The notes are therefore of little value as to the basic obligation though they do

shed some side light on the development and implementation of the conspiracy against Dopp.

*Dopp Would Suffer Irreparable Injury*:

The majority says that Dopp's "inability to prove irreparable injury is in itself sufficient grounds for reversing . . . ." It cites an observation by the trial court that "it is difficult to conceive how" Dopp "may successfully conduct a proxy contest" in light of his financial situation. This was not a finding although the majority tries to elevate it to that level. The finding, despite this observation of the district judge, is that irreparable injury would be suffered by Dopp. Moreover, Widmark and the Galesis were clearly disturbed over the possibility of Dopp securing control:

(1) Dopp was the largest single shareholder with 18 percent of the stock; (2) he was former Chairman and Chief Executive Officer who certainly had connections among the stockholders; (3) he had *"acquired"* 55,000 shares between April and June, 1971, despite the hostile action of Widmark, the Galesis and the Bank toward him; (4) Michael Galesi was inquiring of Sutherland about the Bank's voting of the Dopp stock in the coming election on the date of Sutherland's deposition, October 21; (5) Dopp's ability to stave off creditors while waging the battle for control; and (6) the testimony in the depositions indicating that the disposition of the case was important in the election and that both Widmark and the Galesis were disturbed about it.[2]

The majority cites the outcome of the election—an event occurring after the trial court's action—as conclusive of the point as to irreparable injury. It notes that Dopp lost by 300,000 votes. This methodology is insupportable. It faults the district court for not being clairvoyant. It fails to mention, however, that 250,000 votes were challenged. The Franklin Bank voted Dopp's stock for Widmark. If it had been switched to Dopp and the challenges sustained, Dopp would have been successful. There was clear evidence that Dopp might be successful. Indeed he was remarkably close under the circumstances. The equities being with him on the whole record the injunction was properly granted.

The finding of irreparable injury was also supported by the trial court on another adequate ground i. e. the impossibility of compensating Dopp fully if such a large block of stock had to be purchased on the market in case Dopp was successful on the merits. Dopp claimed that the shares were worth $12 to $15 each; the stock exchange listed them at around $5. The trial court concluded on the concession of the parties that a block of stock of this size could not be sold by the bank through traditional channels:

"If the market is so thin that a block of this size cannot be *sold* without unduly depressing the market, then it follows logically that a block of the size involved cannot be purchased on the market without having converse undue effect on the price. Under these circumstances, plaintiff correctly argues that the block of Butler shares herein involved is unique, and because of its size has no ascertainable market value."

This conclusion is but hornbook law as to the inadequacy of money damages: "Of course, (equitable) remedy should be granted in case the shares cannot be obtained in the market and the plaintiff's damages cannot be ascertained." 5 A Corbin on Contracts § 1148 (1964). The majority seems to say that since the shares are traded on the American Stock Exchange that Dopp's damages are equal to that Exchange's price. This position is incredibly unrealistic and would be entirely unfair. Dopp, if he loses this stock, cannot move back to his 18 percent position without inflating the price to

---

2. The controversy reached the point in the lawsuit that the district judge directed that the voting of the Dopp stock be earmarked so that it might be changed to conform to the outcome on the merits, if necessary.

some unascertainable value. It may be true that he "acquired" 55,000 shares in April and June. This is not in the record here and is taken from the litigation referred to by the majority.[3] It does not show how he "acquired" the stock i. e. by purchase, loan for use in the proxy battle or otherwise. We do know that there was no transfer of this volume made on the Exchange during this period and that Dopp had no money or credit to "acquire" such a block by purchase. Neither of the parties mentioned it in their briefs or arguments and in the light of these facts is entitled to no weight whatever.[4] Moreover, this false support for the majority's decision that money damages will be adequate produces a harsh effect on Dopp. As I have indicated Dopp has insisted throughout the trial that the stock was undervalued on the Exchange. This conclusion, presumably, was reached on solid information obtained by Dopp in his former position with the Company.[5] Under traditional damage rules the measure of damages would be the difference between the contract price and the market or current price "at the time or times when they ought to have been delivered." 5 Corbin on Contracts, *supra*, at § 1101. Applying this standard, Dopp would only receive the market value of the shares on October 1, 1971, the date he learned of

the option less the sum he would pay to meet the terms of the option price. This would be an unconscionable "nothing" in this case. Today the price on the American Stock Exchange is $12 per share.[6] Thus even if he wins his damage suit, Dopp eventually loses $300,000. This hardly affords Dopp an "adequate remedy" while it gives the Galesis a windfall.

For these reasons, I dissent.

---

3. See Committee for New Management of Butler Aviation v. Widmark, 335 F.Supp. 146, 154 (1971).

4. The majority relies on facts stated in *Committee for New Management of Butler Aviation, supra,* which states that Dopp made the following transactions:
   April 8, 1971 ........ 40,000 shares
   June 22, 1971 ........ 200 shares
   June 29, 1971 ........ 15,000 shares
   August 12, 1971 ...... 2,000 shares
   August 16, 1971 ...... 2,500 shares
   The majority implies from this that Dopp was able to effect these transactions over the market without undue effect on the Butler Aviation stock price. Reports of stock exchange dealings for the dates involved do not support this conclusion. On the date of the largest transaction, in which 40,000 shares assertedly changed hands, the trading volume in Butler stock was re-ported at 1400 shares. Wall Street Journal, April 9, 1971, page 16. A small rise in the price occurred. All of the other transactions asserted to have taken place involved much smaller blocks of shares and therefore are not relevant.

5. The present position of the stock on the American Stock Exchange supports Dopp's valuation. The stock is now $12 per share and has withstood the bearish pressures exhibited on the market off and on of late.

6. On October 1, 1971, closing price for Butler stock was 5⅝, New York Times, October 3, 1971, Section 3, page 12. At this price 51,500 shares would be worth $289,687.50.
   On May 11, 1972, the closing price was 11⅝. New York Times, May 12, 1972, page 62. At this price, the shares would be worth $598,687.50.